Matter of K.E. v A.E. (2025 NY Slip Op 51557(U))

[*1]

Matter of K.E. v A.E.

2025 NY Slip Op 51557(U)

Decided on September 25, 2025

Family Court, Kings County

Menon, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 25, 2025
Family Court, Kings County

In the Matter of Article 6 
 Custody/Visitation Proceeding K.E., Petitioner/Respondent,

against
A.E., Petitioner/Respondent

File No. 314098

Joshua Reuven Katz, Esq., 9027 Sutphin Blvd. Ste. 402, Jamaica, NY 11435 for Petitioner/Respondent K.E.
Gregory Gorodetsky, Esq., 1723 E. 12th St., Brooklyn, NY 11229, Counsel for Petitioner/Respondent A.E.

Nisha Menon, J.

Procedural History
On March 31, 2023, K.E. filed a petition for custody of his son, L.E. On that same day, A.E. filed a family offense petition against Mr. E., alleging that he had committed several crimes against her. On or about May 24, 2023, Ms. E. filed a cross-custody petition regarding L. On March 15, 2024, the family offense matter resolved on consent with a one-year Order of Protection which forbid Mr. E. from communicating with Ms. E. except through the Our Family Wizard platform with regard to parenting time and the wellbeing of the child. The trial of these cross-custody petitions also commenced on March 15, 2024, with further testimony being heard [*2]on August 19, 2024, August 21, 2024, September 23, 2024, December 20, 2024, February 14, 2025, February 19, 2025, April 28, 2025, and July 3, 2025. Written summations were due to the Court by August 22, 2025.
Findings of Fact
Mr. E. met Ms. E. on March 28, 2017. Soon after, they developed a relationship. They began living together in September 2017 and were married in August 2019. The couple initially lived together in New Jersey but moved to Brooklyn in October 2020. Their son L. was born on in 2022. Mr. E. was actively involved in prenatal appointments and was present when L. was born. After L. was born, both parents continued to care for him, though Ms. E. was home on parental leave and did the bulk of childcare. 
In early 2022, due to the ongoing war, the couple decided to have Ms. E.'s mother and brother move from Ukraine to live with them in Brooklyn in a two-bedroom apartment. While Ms. E.'s brother moved out after a few months, Ms. E.'s mother continued to reside with the couple and L. After Ms. E.'s mother moved in, she took over some childcare duties including attending well visits with Ms. E. and L.
Ms. E. testified that she went back to work when L. was about 5 months old to support the family financially, including to maintain the family's health insurance. Ms. E.'s mother cared for L. when Ms. E. was working. Ms. E. testified as to the small details of her care of L. including trimming his nails, dancing, playing with Play-Doh, etc. These details support the Court finding Ms. E.'s testimony credible that when she returned from work, she provided the bulk of the childcare. However, the Court does credit Mr. E.'s testimony that he also was involved in caring for L. when he was not working.
Mr. E. repeatedly raised issues that he appeared to believe reflected negatively on Ms. E.'s inherent character and suitability as a parent. He testified that the parties met at a go-go bar that he frequented [FN1]
near his home shortly after Ms. E. began working there. At the time of their marriage, Mr. E. believed Ms. E. had overstayed on a student visa, though Ms. E. submitted documentation indicating that she did have a valid visa at the time they were married and testified that she obtained a green card during the marriage. Mr. E. was critical of Ms. E.'s decision to take the subway with L. the day after a shooting on a subway. While the Court does understand why this caused Mr. E. concern, there is no basis to believe that Ms. E.'s decision to take the subway that day was reckless or inappropriate. Finally, Mr. E. believed that Ms. E. had accidentally locked L. alone in the apartment while having a drink with a neighbor. Ms. E. strongly disputed Mr. E.'s accusations. She testified that she had opened to door to give a package to her neighbor and, when the door shut and locked behind her, she immediately had another neighbor enter her apartment through the shared fire escape to then open her door, which only took a few minutes. Ms. E. is the only person who testified who had direct knowledge of this incident and she appeared candid and forthcoming while doing so. Having had the unique opportunity to observe the demeanor and testimony and assess credibility, the Court credits her [*3]testimony.
In contrast, the Court finds Mr. E.'s testimony significant for demonstrating how negatively he views Ms. E. and his desire to overstate safety and parental fitness concerns about her. Notably, his criticisms of Ms. E. were at times plainly hypocritical, including condemning her for working at a bar that he admitted that he regularly patronized himself, and for attacking her for living in a "dilapidated, terrible place"[FN2]
when he had lived in effectively the "same building, same environment, same everything"[FN3]
that was only "50 feet away"[FN4]
prior to the couple breaking up. Mr. E. also seemed to suggest that Ms. E. was effectively engaging in a fraudulent relationship with him motivated by her seeking immigration status. However, the Court does not find this convincing as Mr. E. was aware of Ms. E.'s immigration status, the couple were together for years, chose to get married, chose to have a child together, and Ms. E. provided compelling evidence that her eventual decision to leave was due to the hostile environment Mr. E. played a significant role in creating. 
In March of 2023, Mr. E. left New York for a five-day business trip. Mr. E. believed that Ms. E. had initially planned to join him on the trip, but shortly before their planned departure she said she had to stay behind to cover a work emergency. On the day he returned and after his plane had landed, Ms. E. texted him that she had taken L. and moved out of the apartment but had fed and walked the dog before she left. Mr. E. responded with a series of vitriolic texts, including "I pray that you die a slow horribly painful death. Like brain cancer you fucking cunt."[FN5]
Mr. E. indicated that he was frantic and desperate to find L. He immediately called the police who arrived at the home before he did. He was then delayed in entering the apartment because he lost his keys but when he did, he believed the dog was "hungry [and] frail."[FN6]

Mr. E. eventually reviewed camera footage from the apartment building and became convinced that Ms. E. was assisted in moving out by the son of her attorney, Mr. Gorodetsky. Ms. E. testified that the person who assisted was someone she had hired and had no connection to her attorney. Nonetheless, Mr. E. repeated the narrative he'd created and returned to the issue several times during his testimony, albeit at time raised by counsel for Ms. E. The Court credits Ms. E.'s testimony as, like with the incident of the apartment door locking with L. inside, Ms. E. is the only person with firsthand knowledge who testified and she presented as credible during her testimony. However, the Court attaches no importance as to who assisted Ms. E. in moving, other than to note Mr. E.'s outrage and fixation on his theory.
Ms. E. testified that she knew Mr. E. would be angry when she and L. left and that she deliberately left before he returned because he was often angry and verbally abusive to her. She explained that she filed for an Order of Protection against him because she "was experiencing [*4]constant pressure, threats, disrespect, humiliation."[FN7]
She conceded that he had never physically harmed her, but testified that he frequently disparaged her, such as calling her a "whore" in front of L.[FN8]
and threatened to inflict physical harm on her.[FN9]
The text messages that he sent to her when he learned she had left, such as specifying that he hopes she dies a slow and painful death like from brain cancer, only bolster her testimony as to the way he would treat her before she left. Ms. E.'s mother, T.U., also testified to observing the couple argue frequently, and that during arguments, Mr. E. would use abusive language towards Ms. E., such calling her "a prostitute, a bitch, a whore [and that] she was stupid,"[FN10]
including saying these things when L. was present.[FN11]

Even text messages that were offered by counsel for Mr. E. and admitted into evidence support Ms. E.'s testimony about his deep, intense anger and derision of her, including statements that "this is an apology for what I will be doing. I will spend every day of my life working to not only win my son back, but also [Ms. E.] will reap the consequences in court, and she will lose everything" [FN12]
and "I swear on L.'s life, that until either I or her die, that I will do all there is to be done to show the world her true devil self."[FN13]
The court also notes that Mr. E. is significantly larger than Ms. E. Given his intense anger, his continuous disparagement of her, the size difference between the two, and his attempts to hold immigration issues over her head [FN14]
, the Court finds it both reasonable and credible that Ms. E. felt intimated by and afraid of Mr. E. 
In the weeks that followed Ms. E.'s move with L., Mr. E. was urgently seeking contact with L. and he continued to reach out to Ms. E. multiple times a day until he was served with an order of protection. He received a temporary order of visitation about 15 days after Ms. E. left with L. Mr. E. testified that Ms. E. cancels his parenting time inappropriately and that he spends $60-70 in tolls plus gas to exercise his parenting time now that Mr. E. moved to New Jersey.
Mr. E. also expressed concern that Ms. E. was not meeting L.'s educational needs. He testified that he had brought up concerns regarding L.'s speech for months before Ms. E. agreed [*5]to obtain services, and that once she did, she obtained services from a Russian speaking provider. Mr. E. objected to L. obtaining services from a Russian speaking provider as Mr. E. does not speak Russian and wants to be able to communicate with L. Ms. E. conceded that at the time Mr. E. first raised issues about L.'s delays, she did not believe L. was significantly delayed and did not take steps to get an evaluation. However, as L. grew older, she saw reasons to be concerned and did arrange an evaluation and services. She believes, based on emails she received from a service provider that allegedly included forwarded communication between Mr. E. and the provider, that Mr. E. thwarted her efforts to obtain services by threatening providers who speak Russian. For this reason, she has consented to L. receiving some of his services in New Jersey. It is clear from both parties' testimony that they cannot make decisions together. Ms. E. presented evidence of providing Mr. E. with medical information and documents [FN15]
, yet he still complained and criticized the medical treatment. The evidence and testimony demonstrated that any attempt to discuss the substance of an educational or medical decision with Mr. E. would devolve from a discussion of the issue at hand into a diatribe by Mr. E. about how horrible of a person and mother Ms. E. is.
Legal Analysis
In summations submitted by counsel, each parent respectively contends that they should be awarded sole legal custody. Ms. E. contends that she should also be awarded primary physical custody, while Mr. E. contends that the parties should be both awarded joint physical custody with a 50/50 split of parenting time on a 5-5-2-2 type schedule. On summation, for the first time, Mr. E. also reports that "regardless of how this Court determines legal custody, [he] shall return to reside in Brooklyn, within a short distance of [Ms. E.'s] residence."[FN16]
However, it is notable that there was no testimony at trial whatsoever by Mr. E. about his intent to relocate to Brooklyn. Instead, he testified at length about what he believed where the advantages of his residence in New Jersey, which makes the Court unable to consider his newly stated intend to relocate to Brooklyn a reliable plan.
The decision to grant initial custody of a child must be based upon the best interests of the child standard. See, Friederwitzer v Friederwitzer, 55 NY2D 89 (1982); Eschbach v. Eschbach, 56 NY2d 167 (1982). Ms. E.'s history as the primary caretaker for L., her more stable demeanor, and her credible assertion that she will comply with orders for her son to have parenting time with her father, all weigh in favor of an award of custody to Ms. E. being in L.'s best interest. 
Mr. E. testified that he believes that he is the parent better able to provide for L., that he has a nicer home environment (in New Jersey), and that he would be more supportive of a healthy coparenting relationship. 
The Court does not credit Mr. E.'s contention that he is the parent better able to financially support the child. Mr. E. admitted he needed to file for bankruptcy in part due to legal fees. Ms. E. testified that she went back to work because the family was struggling [*6]financially and they needed health insurance. The Court does not find that financial stability weighs in either parent's favor. Rather, they both appear to be similarly able to meet L.'s basic needs.
Mr. E. testified that the couples' move to Brooklyn was always meant to be temporary. He testified that he felt that L., by primarily residing with his mother in Brooklyn during the pendency of this matter, was "living in a dilapidated, terrible place."[FN17]
He went on to testify about the "resort-style living"[FN18]
that he enjoys in New Jersey, and his intent to enroll L. in a private school operated by his church in East Brunswick. However, Mr. E.'s contentions in this regard were merely conclusory, and they were further undermined by his statements in summation that he newly intends to return to reside in Brooklyn. Further, when determining which environment is more suitable for the child to primarily reside, it is more imperative to consider which environment is more supportive of the child having a healthy relationship with the other parent than it is to consider which environment offers "resort-style living." 
The determination of how much parenting time and under what parameters is in the best interests of the child is left to the discretion of the Family Court. See e.g. Larkin v White, 79 AD3d 751, 751 [2d Dept 2010]; McMillian v Rizzo, 31 AD3d 555, 555 [2d Dept 2006].
An award of joint custody here is not appropriate. "Entrusting the custody of young children to their parents jointly, especially where the shared responsibility and control includes alternating physical custody, is insupportable when parents are severely antagonistic and embattled." Braiman v Braiman, 44 NY2d 584, 587 [1978]. "Joint custody is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion." Id. 589-90. These parents have an acrimonious relationship characterized by Mr. E.'s attempts to control and undermine Ms. E., as described below. 
The Court further finds it would not be in L.'s best interests to award sole custody to Mr. E. The Court did not find Mr. E. credible in his claims that he is the parent best able to support coparenting. Through his testimony, written exhibits (including the text exchanges he submitted), and his demeanor during the trial, Mr. E. demonstrated that he has intense contempt for Ms. E. that he is unable to look past in the context of his coparenting relationship. Indeed, the text messages admitted as Petitioner's Exhibit 7, messages between Mr. E. and Ms. E.'s mother, demonstrate the depth of his anger. "Your daughter is not only a liar, ex stripper, a cheat and a con artist, she is unfortunately the mother of my child."[FN19]
"L. will eventually make her pay when he sees her true self."[FN20]
"I will never teach him to hate her, but he will know every detail of what she did when he is old enough, and he will decide if she is a 'mother' or . . . . [sic]"[FN21]
"Apparently you think any female is a mother, but a mother is something [Ms. E.] would [*7]never understand."[FN22]
Respondent's Exhibit L also included text messages from Mr. E. telling Ms. E. "you're not his mother. A mother is not someone who gives birth. A Mother is something you can never be."[FN23]
"I AM HIS ONLY PARENT."[FN24]
Although these same text messages from Mr. E. accuse Ms. E. of failing to coparent and trying to alienate the child, these messages provide clear additional support for the Court's finding that Mr. E. himself does not support co-parenting with Ms. E. but instead actively discourages it.
L. is currently three years old and undoubtably will only be more and more aware of how his parents talk about and treat one another as he grows older. Mr. E. has given this Court every reason to believe that L. will grow up with an acute awareness of his father's contempt for his mother. The statement that he won't "teach [L.] to hate [his mother]"[FN25]
but that he will make sure that his son "will know every detail of what she did,"[FN26]
is but one example of his inability to shield L. from the intensity of his hatred for L.'s mother.
Furthermore, Mr. E.'s admissions of open contempt for Ms. E. such as the example above raises great concern to this Court as it is a hallmark symbol of a parent intending to use coercive control to alienate a child from the other parent. Pursuant to Domestic Relations Law §240, this Court must consider the effects of domestic violence upon the best interest of L. Mr. E.'s attempts to dominate Ms. E. and undermine her as parent are properly considered as domestic violence. "For over 15 years, scholars have understood that domestic violence is not limited to acts of overt physical aggression but rather can exist through the interpersonal relationship dynamics of two adults. One partner may exert coercion over the other, using 'force or threats to compel or dispel a particular response.' Evan Stark, Coercive Control: How Men Entrap Women in Personal Life 228 (2007). Independently, a relationship may feature one partner controlling the other, through 'structural forms of deprivation, exploitation, and command that compel obedience indirectly.' Id. at 229. Coercion and control can exist together, creating a 'condition of unfreedom' also known as entrapment. Id. at 205." Matter of Aisha R., 79 Misc 3d 1106, 1109-10 [Fam Ct 2023]. 
Mr. E.'s behavior as described by Ms. E. clearly demonstrate a pattern of coercive control. She described him as demeaning, easily enraged, and limiting her ability to get day care and educational services for L. The Court credits this testimony as it comports both with the text messages and Mr. E.'s demeanor in court. During Ms. E.'s testimony, Mr. E. rolled his eyes, scoffed, and appeared incredulous throughout, underscoring his attempts to undermine her. This type of abuse puts Ms. E. at risk even after the termination of her marriage to Mr. E. "Coercive control can have devastating impacts on victims/survivors. In addition to its well-documented effects on physical and mental health, [researchers] highlight that coercive control limits [*8]victims'/survivors' space for action, that is their freedom to say and do things and to meet their own needs without worry or fear. As perpetrators microregulate their everyday behaviors, victims'/survivors' options, choices, and ability to decide for themselves diminish. These constraints on their agency and voice often contribute to a profound disempowerment, loss of self, and loss of confidence in victims/survivors." Emma Katz, Beyond the Physical Incident Model: How Children Living with Domestic Violence are Harmed By and Resist Regimes of Coercive Control," 25 Child Abuse Rev. 46, 48 (2016) (citations and internal quotation marks omitted). Ms. E.'s testimony reflects examples of her giving into Mr. E.'s attempts at control. Specifically, she admitted to signing a lease in New Jersey (Petitioner's Exhibit 4) with the father just weeks before she ended the relationship because he was constantly pressuring her to do so.[FN27]
She also testified to failing to object to the father arranging services for L. in New Jersey after he undermined her efforts to obtain services near her home. Were this Court to give Mr. E. primary custody of L., Ms. E. would be vulnerable to further control as she sought to preserve her relationship to L.
Mr. E.'s behavior not only has a detrimental impact on Ms. E. who is currently L.'s primary caregiver, it also directly places L. at risk. "Research has shown that children are not only witnesses to domestic violence, but actual victims who experience the same dynamics in the home." Aisha R. at 1113 (citing Katz, supra at 52). Children exposed to domestic violence have been found to have similar levels of emotional and behavioral problems, trauma symptoms, and compromised social and academic development similar to those of children who are direct victims of the abuse. Samantha Jeffries, In the Best Interests of the Abuser: Coercive Control, Child Custody Proceedings and the "Expert" Assessments That Guide Judicial Determinations, 5 LAWS 1, 2-3 (2016). Even though L. may currently be too young to vividly display the signs of harm from exposure to domestic violence, that does not mean that the risks are not real, and it is in his best interest to minimize his further exposure to such violence. 
The impact is not limited to children who witness physical violence. "As one court quoted an expert, '[the domestic violence] isn't necessarily physical but may be more dangerous because it's emotional and much harder to detect.'" Lisa Tucker, Domestic Violence as a Factor in Child Custody Determinations: Considering Coercive Control, 90 Fordham L. Rev. 2673, 2677 (quoting G.I. v J.S., CK16-03072, 2017 WL 4792366, at *4 [Del Fam Ct May 18, 2017]). The effect can be serious and long term. "Children who witness domestic violence can suffer serious emotional symptoms including internalizing symptoms (e.g., anxiety, depression, fear, shame, social withdrawal, somatic complaints, bedwetting, poor concentration) and externalizing symptoms (e.g., aggression, impulsivity, bullying, criminal behaviors)." Debra Pogrund Stark et. al., Properly Accounting for Domestic Violence in Child Custody Cases: An Evidence-Based Analysis and Reform, 26 Mich J Gender & L 1, 22 [2019]. And the physical separation of the parents does not mean the end of risk of harm, as "post-separation, perpetrators/fathers can continue to target coercive control at children as well as at their ex-partners. . . . Like adult victims/survivors, many of the children and young people were living under conditions of [*9]constraint and entrapment, and coercive control could severely harm their emotional/psychological, social and physical wellbeing and their educational achievement." Emma Katz, Anna Nikupeteri & Merja Laitinen, When Coercive Control Continues to Harm Children: Post-Separation Fathering, Stalking and Domestic Violence, 29 Child Abuse Rev. 310, 322 (2020) (internal citation omitted). 
Mr. E. claiming he won't "teach [L.] to hate"[FN28]
his mother is only feigning innocence when he effectively says he intends to do everything he can to encourage L. to feel the same way about Ms. E. as he does by way of "every detail"[FN29]
he will tell his son. It is not in L.'s best interest to be in an environment where he would not be allowed to freely love and appreciate both of his parents, nor should he be placed at risk of the long-lasting psychological impacts that can arise from such an environment. He should primarily reside in an environment free from manipulation, sabotage, or conditioning meant to inspire hatred. Conversely, the evidence and testimony has not given the Court any reason to have any serious concerns that Ms. E. intends to foster such an environment for L. which would be similarly hostile to L.'s relationship with his father. Even in the midst of heated text messages between the parties, Ms. E. implored Mr. E. to "think of L. first"[FN30]
and pointed out that L. "needs his mother, and father too. We both will be in his life, and in each others unfortunately too, despite you want it or not. [sic] Maybe instead of initiating war, try to make peace."[FN31]
Notably, no credible evidence was presented that Ms. E. failed to comply with this Court's orders regarding Mr. E.'s parenting time during the pendency of this case.
While counsel for Mr. E. contends that his text messages after learning that Ms. E. had left the home with their son were "justifiably angry,"[FN32]
and contends that Ms. E.'s "entire case was based upon angry text messages sent by the father after she abandoned him and absconded with his baby,"[FN33]
the Court must be clear that the bulk of relevant evidence to support its findings either significantly pre-date or post-date the period of shock from learning that Ms. E. had left with their son. Ms. E. testified to the constant threats, disrespect, and humiliation she suffered throughout their relationship and before she decided to leave with L., and the text messages admitted as Petitioner's Exhibit 7 are from November 2023, more than seven months after Ms. E. left and the instant custody litigation was commenced. Further, angry text messages, regardless of the time period, are not the sole basis of this decision, but are pieces of significant evidence which corroborate the credible testimony of Ms. E. 
[*10]Decision and Order on V-06482-23
Accordingly, for the reasons set forth above, it is hereby
ORDERED after the Court having searched the statewide registry of orders of protection, the sex offender registry and the Family Court's warrant and child protective records, and having notified the attorneys for the parties and for the child there are no current results,
Mother, A.E., is awarded sole legal and physical custody of the child L.E.
Father, K.E., is awarded parenting time as follows. He shall have alternate weekends, father to pick up the child from daycare/school on Friday and return the child to mother's home curbside on Sunday by 5pm. He shall also have weekly overnight visits from Tuesday 3pm until Wednesday 7pm. However, once L. is enrolled in full time school, the father's Tuesday evening overnight visits into Wednesday shall be contingent upon on the father residing within 10 miles of the child's home, as to not unduly interfere with his schooling. 
Mr. E.'s parenting time shall continue over the summer with pick up at 5:00pm Friday and to Sunday at 5:00pm drop off, exchange location to be curbside at the home of the mother.
The regular parenting schedule shall continue over the summer except that both parents shall be entitled to a two-week block of parenting time over the summer with dates to be provided on March 1 each year. In even years, father's choice shall be given first priority and in odd years, mother's choice shall be given first priority. The continuation of the parenting schedule will allow L. to remain enrolled in any year-round services he may be participating in.
In odd years, father shall have Thanksgiving break from Wednesday before Thanksgiving pickup at school/day care to Sunday at 5:00pm. In even years, mother shall have Thanksgiving break.
In odd years, mother shall have Christmas break from the last day of school/day care until December 26 at 5:00pm and father shall have remainder of break until the night before school resumes at 5:00pm. In even years, father shall have Christmas break from the last day of school/day care until December 26 at 5:00pm and mother shall have remainder of break until the night before school resumes at 5:00pm. Exchanges curbside at mother's home.
The parent who had Thanksgiving shall have the child for the midwinter (February) break of the same school year, if any. The parent who had Christmas shall have the child for the Easter/spring break of the same school year, if any.
Mother's Day shall be with Ms. E., and Father's Day shall be with Mr. E.
The parent not scheduled be with L. on his birthday per the above terms shall be afforded an option to be with him for at least one hour if it falls on a school day, or for four hours if it falls on a weekend. Birthday time must be requested at least 30 days before L.'s birthday.
If either parent shall travel overnight out of the state with L. (except for NJ, CT, or PA), they must provide the address where L. will be to the other at least 48 hours before travel.
Both parents shall have full, independent access to the child's medical, educational and religious records and providers. 
Neither parent shall disparage the other, nor allow any third parties to do the same in the presence of the child. 
All communication between the parties shall be via the Our Family Wizard app platform or any other mutually agreed upon platform for communication. 
Each parent may call/video L. once a day at 7:00pm when he is with the other parent. L. shall be permitted to initiate other calls/video calls to the other parent at other times.
Mother may not relocate with the child beyond a 15-mile radius of her current residence without written consent by father or court order, unless such relocation is closer to the father's residence.
Order on V-10782-23:
This docket is dismissed with prejudice as custody and parenting time is awarded as described above under Docket V-06482-23.
Dated: September 25, 2025
ENTER:
Hon. Nisha Menon

Footnotes

Footnote 1: While on cross examination Mr. E. denied that he visited this particular bar "often," but he also did testify that it was the "closest bar to home" and that he would go there "once every ten days, once every two weeks." Tr 8/19/24 at 6-7.

Footnote 2: Tr 3/15/24 at 48, lines 13-14

Footnote 3: Id. at 49, lines 1-2

Footnote 4: Id. at 48, lines 24-25

Footnote 5: Respondent's Exhibit A

Footnote 6: Tr 3/15/24 at 28, line 19

Footnote 7: Tr 8/21/24 at 26, lines 14-15

Footnote 8: Tr 9/21/24 at 33, lines 3-4

Footnote 9: Tr 9/23/24 at 70, lines 18-19 ("He would threaten to slap me if I won't stop talking, he would threaten me that he will abuse me, yes . . . ")

Footnote 10: Tr 2/19/25 at 14, lines 9-10

Footnote 11: Id. at 14, lines 13-15

Footnote 12: Petitioner's Exhibit 7 at 2, 3

Footnote 13: Id.at 3

Footnote 14: Petitioner's Exhibit 7 at 5. ("Hate his mother? I don't need to teach him that, once he realizes that she is a money worshipper and that she alienated him from his father, lied about everything, used his father to get money and a green card, and used him to have her lifestyle financed, he will automatically know who she is.")

Footnote 15: Respondent's Exhibit K

Footnote 16: Petitioner Father's Post Trial Summation at 10

Footnote 17: Tr 3/15/24 at 48, lines 13-14

Footnote 18: Id. at 50, line 17

Footnote 19: Petitioner's Exhibit 7 at 2 (and duplicated at 3)

Footnote 20: Id. at 3

Footnote 21: Id. at 5

Footnote 22: Id. at 7

Footnote 23: Respondent's Exhibit L at 5

Footnote 24: Respondent's Exhibit L at. 8

Footnote 25: Petitioner's Exhibit 7 at 5

Footnote 26: Id.

Footnote 27: Tr 12/20/24 at 4, lines 16-21. ("It was always an argument between us. I never wanted to move to New Jersey. He was pushing, pressuring me to move there." . . . "Under his pressure, at some point I did agree.")

Footnote 28: Petitioner's Exhibit 7 at 5

Footnote 29: Id.

Footnote 30: Respondent's Exhibit 7 at 7

Footnote 31: Id.

Footnote 32: Petitioner Father's Post Trial Summation at 2

Footnote 33: Id. at 7